# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-1358
_____

Benjamin Zarn

*Plaintiff - Appellant*

v.

Minnesota Department of Human Services

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 23, 2025
Filed: February 2, 2026
_____

Before LOKEN, BENTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Benjamin Zarn sued his employer—the Minnesota Department of Human Services (MDHS)—alleging religious discrimination in violation of Title VII, the Americans with Disabilities Act (ADA), the Minnesota Human Rights Act, and the

Minnesota Refusal of Treatment statute. The district court[1] dismissed Zarn's Minnesota state law claims pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction; it also found that the Minnesota Refusal of Treatment claim failed to state a claim upon which relief may be granted in violation of Federal Rule of Procedure 12(b)(6). Subsequently, the district court granted summary judgment in favor of MDHS on his federal law claims. Zarn now appeals the grant of summary judgment to MDHS. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

Since 2018, Benjamin Zarn has been employed as a Forensic Support Specialist at St. Peter Regional Treatment Center, which MDHS runs and the state of Minnesota funds. Zarn's main job responsibility is to "provid[e] direct care, treatment, support, and leisure activities while ensuring a safe environment to individuals who are committed to the Commissioner of Department of Human Services (DHS) in a secure setting."

Relevant to this lawsuit, the Minnesota Management and Budget Office (MMB) promulgated two policies regarding Covid-19 protocols for executive branch employees in 2021. First, on August 11, 2021, MMB circulated a policy requiring all executive branch employees who do not exclusively telework to either provide proof of the Covid-19 vaccine or take (at least) weekly Covid-19 tests (Covid Policy). In explaining the Covid Policy, MMB noted that "[t]he virus is highly contagious, including among asymptomatic people, and potentially deadly," and as of August 6, 2021, over 7,600 people in Minnesota had died from it. Moreover, MMB stated that the Centers for Disease Control and Prevention (CDC) and the Minnesota Department of Health (MDH) have concluded that being vaccinated against Covid-19 is the best way to prevent infection and spread of the disease. MDHS adopted the Covid Policy, and it took effect for all employees on

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

September 8, 2021. Second, on September 29, 2021, MMB circulated an internal memo explaining that individuals who were fully vaccinated against Covid-19 and tested positive for Covid-19 were permitted to use up to seven days of paid administrative leave if such employees had exhausted their sick leave (Covid Pay Policy).

Zarn objected to the Covid Policy; he argues that it violated his moral conscience. In any case, Zarn signed a Covid testing consent form, which indicated his agreement to comply with the Covid Policy, and he participated in weekly saliva testing. However, he maintains that he signed the form against his will as he feared that he would be fired if he did not do so. Zarn is Catholic and he asserts that "the church teaches about moral conscience and how everyone has to obey his or her conscience." He contends that his "moral conscience told [him] not to get" the vaccine as it "used aborted fetal cells," and he maintains that he had "natural immunity" to the virus. Regarding the testing requirement, he argues that "segregating one group of people from another" is not supported by science and his "moral conscience saw that as discriminatory." Zarn considers this to be a religious objection.

Zarn communicated his dissatisfaction with the Covid Policy to his supervisor, his union president, and MDHS and MMB administrators; however, he did not request a religious accommodation from any of these individuals. Indeed, Zarn's supervisor Robbie Bach testified that she was familiar with Zarn's religious affiliation; however, Zarn did not inform her that he had *religious* objections to the Covid testing requirement, nor did he request a *religious* exemption from the policy. Rather, Zarn merely expressed more generalized concerns to her about the Covid Policy, making statements along the lines of "nobody can tell me what the lasting effects will be and what the side effects will be." She understood that Zarn thought the Covid Policy was unfair, but he did not communicate (nor did she ask) whether his religion informed this belief.

-3-

Zarn also discussed the Covid Policy with Ryan Cates, his union president. Zarn asked Cates whether religious exemptions were available for the Covid testing policy. Cates understood Zarn to be seeking clarification as to the Covid Policy's requirements, not requesting that he seek a religious accommodation on his behalf. Accordingly, Cates spoke with MDHS's management and learned that religious exemptions were available for the vaccine requirement but not for the testing requirement. Cates did not speak to MDHS's management about accommodating Zarn's religious beliefs. In any case, Cates testified that he cannot make a religious exemption request on behalf of another person.

Finally, Zarn expressed his dissatisfaction with the Covid Policy to MMB and sought information from MDHS regarding how to file a hostile work environment claim. On August 17, 2021, Zarn emailed MMB Commissioner Jim Schowalter stating: "I have a ton of concerns about this new vaccine/weekly testing mandate that just came out . . . . I was wondering if I could set up a time to call you about this policy." Schowalter connected Zarn with Enterprise Continuity Director Cathy Hockert, and she proposed a time for them to talk on August 18, 2021. There are no factual allegations as to whether Zarn and Hockert spoke. Additionally, on February 15, 2022, and February 18, 2022, Zarn emailed the MDHS Human Resources Department asking how to file a hostile work environment complaint; he did not include any information as to why he wanted to file such a complaint.[2]

Zarn filed two charges with the Equal Employment Opportunity Commission (EEOC): one in March 2022, alleging that the Covid Policy discriminated against his religious beliefs in violation of Title VII and another in May 2022, alleging that the Covid Policy violated the ADA. Zarn received right-to-sue letters from the EEOC regarding both claims. In May 2022, MMB rescinded the Covid Policy.

---

[2]Zarn also alleges that he filed a discrimination report with MDHS; however, the record does not contain any evidence corroborating this assertion.

In July 2022, Zarn filed the present lawsuit against MDHS alleging that its refusal to accommodate his religious beliefs regarding the Covid Pay Policy and Covid Policy violated Title VII, the ADA, the Minnesota Human Rights Act, and the Minnesota Refusal of Treatment statute. MDHS filed a motion to dismiss Zarn's Minnesota state law claims. The district court granted the motion, finding that it did not have subject matter jurisdiction over these claims as sovereign immunity barred them. It also held that the Minnesota Refusal of Treatment claim failed to state a claim upon which relief may be granted.

Subsequently, the district court granted MDHS's motion for summary judgment regarding Zarn's federal law claims. First, it found that Zarn failed to exhaust the required administrative remedies for Title VII claim based on the Covid Pay Policy. Second, it held that MDHS was entitled to summary judgment regarding Zarn's Covid Policy Title VII claim as Zarn neither notified MDHS of his religious conflict with the Covid Policy nor experienced an adverse employment action. Finally, it granted summary judgment to MDHS regarding Zarn's Covid Policy ADA claim as it found that the Covid Policy was not an unlawful medical examination. Zarn appeals.

II.

Zarn contends that the district court erred in granting MDHS's motion for summary judgment. We review a grant of summary judgment de novo, "viewing the record in the light most favorable to the nonmoving party." Conway v. Mercy Hosp. St. Louis, 146 F.4th 704, 708 (8th Cir. 2025). "We will affirm the grant of summary judgment 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Shirrell v. St. Francis Med. Ctr., 793 F.3d 881, 885 (8th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)).

A.

We first consider whether Zarn exhausted his administrative remedies for his Title VII claim concerning the Covid Pay Policy. "Exhaustion of administrative remedies is central to Title VII's statutory scheme." Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994). Before filing a lawsuit in federal court, "a plaintiff must 'provide[] the EEOC the first opportunity to investigate discriminatory practices and enable[] it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts.'" Ringhofer v. Mayo Clinic, Ambulance, 102 F.4th 894, 898 (8th Cir. 2024) (alterations in original) (quoting Williams, 21 F.3d at 222). To do so, "an individual must: (1) timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge and (2) receive notice of the right to sue." Williams, 21 F.3d at 222. Here, the parties dispute whether Zarn satisfied the first prong.

"A plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are like or reasonably related to the substance of charges timely brought before the EEOC." Id. Over time, this Court has "considerably narrowed [its] view of what is 'like or reasonably related' to the originally filed EEOC allegations." Wedow v. City of Kansas City, 442 F.3d 661, 672 (8th Cir. 2006). Accordingly, "a discrete act of discrimination constitutes a separate actionable employment practice, and each discrete act starts a new clock for filing charges based upon it." Id. at 673.

Zarn's Title VII EEOC charge does not contain any allegations about the Covid Pay Policy. It states, in relevant part, that Zarn "hold[s] a religious belief that conflicts with [his] employer[']s vaccination and testing requirement" and that he "notified [his] employer of [his] religious belief and requested a religious accommodation to [his employer's] . . . vaccination and testing mandate, which was denied." While Zarn's failure to mention the Covid Pay Policy in his Title VII charge does not foreclose administrative exhaustion, he must show that the Covid

-6-

Pay Policy is "like or reasonably related" to the allegations contained in his EEOC charge. Wedow, 442 F.3d at 672 (citation omitted). He cannot do so.

MDHS issued the two policies on different dates, and the policies do not overlap. The Covid Policy took effect on September 8, 2021, and it does not mention the Covid Pay Policy. It does not appear that employees were notified about the Covid Pay Policy until MDHS circulated a memo explaining it on September 29, 2021. Thus, these two policies are separate, discrete acts and the EEOC's investigation into Zarn's claim regarding the Covid Policy would not necessarily encompass the Covid Pay Policy absent specific allegations.

Moreover, Zarn alleges that the Covid Pay Policy caused him distinct harm from the Covid Policy. He contends that the adverse action associated with the Covid Pay Policy was lower pay whereas the adverse action associated with the Covid Policy was the requirement that he take weekly Covid-19 tests. Because Zarn alleges that the Covid Pay Policy caused him unique harm, separate from the Covid Policy, he was required to mention the Covid Pay Policy in his EEOC charge to exhaust his administrative remedies. See Richter v. Advance Auto Parts, Inc., 686 F.3d 847, 851 (8th Cir. 2012) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice' . . . . for which administrative remedies must be exhausted" (citations omitted)). Since he did not do so, he did not administratively exhaust his Covid Pay Policy claim.

In any event, Zarn never requested Covid Pay. He cannot claim to have been treated differently by not receiving a benefit he never sought. See Williams, 21 F.3d at 222 (explaining that the purpose of the Title VII administrative exhaustion requirement is to "provide[] the EEOC the first opportunity to investigate discriminatory practices"). Accordingly, we find no error in the district court's conclusion that Zarn failed to exhaust his administrative remedies regarding the Covid Pay Policy claim.

B.

Next, Zarn challenges the district court's finding that he failed to establish a prima facie case of religious discrimination with respect to the Covid Policy for failure to accommodate in violation of Title VII.[3]

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). We apply a three-part test that employees must satisfy to establish a prima facie case of religious discrimination for failure to accommodate. Ringhofer, 102 F.4th at 900. An employee "must show he (1) has a bona fide religious belief that conflicts with an employment requirement, (2) informed the employer of such conflict, and (3) suffered an adverse employment action." Ollis v. HearthStone Homes, Inc., 495 F.3d 570, 575 (8th Cir. 2007). The district court found that Zarn failed to establish the second and third elements of the prima facie case.

The parties contest whether Zarn satisfied the second prong of the prima facie case. "An employer need have 'only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements.'" Brown v. Polk Cnty., 61 F.3d 650, 654 (8th Cir. 1995) (citation omitted). Zarn

[3]The complaint alleges both a religious discrimination claim and a failure to accommodate claim. However, the district court only considered Zarn's failure to accommodate claim, and Zarn did not object to this. Moreover, while Zarn discussed the different frameworks that apply to religious discrimination claims with direct and indirect evidence, he made no arguments regarding their application. As such, to the extent that Zarn continues to allege a general religious discrimination claim, it has been forfeited and therefore is unnecessary for us to address. See United States v. Zavala, 427 F.3d 562, 564 n.1 (8th Cir. 2005) (finding that the plaintiff "abandoned the argument" when he "fail[ed] to provide any reasons or arguments" for his position).

argues that his conversations with his supervisor Robbie Bach and union president Ryan Cates and the emails he sent to MDHS and MMB informed MDHS of his religious conflict with the Covid Policy. He is wrong.

First, Zarn did not inform Bach that he had a religious conflict with the Covid Policy. Although Bach knew both that Zarn was religious and he thought that the Covid Policy was unfair, Zarn did not tell her he had a religious objection to the Covid-19 testing requirement, nor did he request a religious exemption from the Covid Policy. Communication of dissatisfaction with the Covid Policy, without linking such dissatisfaction to his religious beliefs, is insufficient to satisfy the employer notification requirement. Cf. Ollis, 495 F.3d at 575 (finding the second element of the prima facie case satisfied when the plaintiff informed his supervisors of the conflict between the policy requirements and his religious convictions).

Zarn's conversation with union president Cates also does not satisfy the employer notification requirement. As an initial matter, Cates is not Zarn's employer, and Zarn does not cite any cases holding that informing one's union president about a religious conflict is sufficient to meet the employer notification requirement. In any event, Cates understood Zarn only to be seeking clarification regarding the Covid Policy—not a religious accommodation. Cates did not ask MDHS's management to accommodate Zarn's religious beliefs.[4] That an employee seeks general clarification about a policy from his union president does not inform the employer of that employee's religious conflict with the policy. See Hunter v. UPS, Inc., 697 F.3d 697, 703 (8th Cir. 2012) ("[T]he employee must show that the employer was sufficiently aware of the employee's [religion] to have been capable of discriminating based on it.").

Finally, Zarn's emails to MMB and MDHS fail to satisfy the second element of the prima facie case. Zarn's email to the MMB Commissioner stated that he had

---

[4]In any case, Cates testified that he cannot request a religious exemption for another person.

-9-

"a ton of concerns" about the Covid Policy, but once again, he did not mention any religious objections. An MMB employee responded to Zarn and proposed a time for them to talk, but the record does not contain evidence that such a conversation took place, or if so, what was discussed. An email expressing "a ton of concerns" about the Covid Policy without further explanation is insufficient for MDHS to "understand the existence of a conflict between the employee's religious practices and the employer's job requirements." Brown, 61 F.3d at 654 (citation omitted). Therefore, this email cannot satisfy the second element of the prima facie case.

Moreover, Zarn's email to MDHS simply asked how to file a hostile work environment complaint. He did not describe the complaint. Although he maintains that he filed a discrimination report with MDHS, the record does not corroborate this assertion. Inquiring about filing a hostile work environment claim without further allegations does not come close to satisfying the employer notification requirement.

Because none of the communications that Zarn identified notified MDHS of a conflict between his religious beliefs and the Covid Policy, Zarn failed to establish the second element of the prima facie case for religious discrimination under Title VII for failure to accommodate. Although the parties also dispute whether Zarn suffered an adverse action, it is unnecessary for us to address this issue as Zarn did not satisfy the employer notification requirement. See Tatum v. City of Berkeley, 408 F.3d 543, 549-50 (8th Cir. 2005) (finding that a failure to establish one element of a prima facie case defeats a Title VII discrimination claim). Thus, we affirm the district court's grant of summary judgment to MDHS regarding Zarn's Title VII failure to accommodate claim.

C.

Next, we turn to Zarn's ADA claim. He argues MDHS's Covid testing requirement was neither job-related nor consistent with business necessity and therefore violated the ADA.

Pursuant to the ADA, covered employers cannot "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A person need not be disabled to bring a claim under § 12112, see Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007), but he must show that the employer's "violation of the ADA caused some sort of tangible injury," Hustvet v. Allina Health Sys., 910 F.3d 399, 406-07 (8th Cir. 2018) (citation omitted). Section 12112's prohibition against discrimination applies to medical examinations and inquiries. 42 U.S.C. § 12112(d)(1).

While "[t]he ADA does not forbid all medical examinations and inquiries," it "generally prohibits employers from requiring current employees to undergo medical examinations or inquiries unless the employer can demonstrate they are 'job-related and consistent with business necessity.'" Hustvet, 910 F.3d at 406 (citation omitted). Moreover, the exam or inquiry must be "no broader or more intrusive than necessary." Id. at 408. "[W]hen an employer requires a *class* of employees to submit to a medical exam, it also 'must show that it has reasons consistent with business necessity for defining the class in the way that it has.'" Id. (citation omitted). The employer satisfies this burden when it "show[s] 'a "reasonable basis for concluding" that the class poses a genuine safety risk and the exam requirement allows the employer to decrease that risk effectively.'" Id. (citation omitted).

Although we have not previously been called upon to determine whether Covid tests are a lawful medical examination, the EEOC has issued guidance regarding the permissibility of employers requiring its employees to undergo Covid testing. Such guidance is not binding on this Court, but we find it to be persuasive and helpful; and Zarn has not identified any cases that have called this guidance into question. See In re Union Pac. R.R. Emp. Pracs. Litig., 479 F.3d 936, 943 (8th Cir. 2007) (finding that EEOC "policy statement[s] or enforcement guideline[s]" are

"respect[ed] . . . 'only to the extent that those interpretations have the "power to persuade"'" (quoting Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000))).

Indeed, the EEOC found that Covid tests are medical examinations within the meaning of the ADA. EEOC, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, (May 15, 2023), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws [https://perma.cc/HTP6-XP2T]. Therefore, if an employer requires employees to submit to such testing, it must be "job-related and consistent with business necessity." Id. The EEOC states that employers can consider the following when determining whether testing requirements comport with business necessity:

> the level of community transmission, the vaccination status of employees, the accuracy and speed of processing for different types of COVID-19 viral tests, the degree to which breakthrough infections are possible for employees who are "up to date" on vaccinations, the ease of transmissibility of the current variant(s), the possible severity of illness from the current variant, what types of contacts employees may have with others in the workplace or elsewhere that they are required to work (e.g., working with medically vulnerable individuals), and the potential impact on operations if an employee enters the workplace with COVID-19.

Id.

We find that MDHS's requirement that unvaccinated individuals take a weekly Covid-19 test was consistent with business necessity. First, MMB considered the level of community transmission, indicating that as of early August 2021, 7,600 Minnesotans had died from Covid. Second, MMB considered the contact that employees have with others in the workplace as the Covid Policy did not apply to individuals who exclusively worked from home. Finally, MMB stated that, as reported by the CDC and the MDH, vaccination is the most effective measure to prevent infection. See Hustvet, 910 F.3d at 408-09 (finding an employer

-12-

mandated health screening to be consistent with business necessity when the employer followed the recommendations of the CDC and the requirement furthered the employer's "overarching internal policy of ensuring employee and patient safety"). Therefore, it is reasonable that MMB wanted to monitor infection rates among unvaccinated individuals—and the testing requirement was the best way for MMB to do so and was not more intrusive than necessary. See Parker v. Crete Carrier Corp., 839 F.3d 717, 723 (8th Cir. 2016) (holding that requiring employees over a certain body mass index to complete a sleep study was not more intrusive than necessary because it was the best way to test for sleep apnea). MDHS's consideration of these factors is sufficient to satisfy the business necessity standard.

Moreover, the requirement that Zarn take a Covid test weekly was job-related. His job requires him to interact directly with patients as his main job responsibility is to "provid[e] direct care, treatment, support, and leisure activities while ensuring a safe environment to individuals." Because Zarn works directly with patients and is responsible for keeping them safe, MDHS's weekly Covid-19 testing requirement was directly related to his job. See Hustvet, 910 F.3d at 408-09 (concluding that an employer's decision to require "employees with client contact . . . to undergo a health screen was job-related" because "the purpose[] of [the employer's] health screen" was, in part, to guarantee that these employees "had immunity to communicable diseases").

Additionally, "[f]ederal courts—including the District of Minnesota—have consistently held that subjecting employees to COVID-19 testing 'does not amount to an unlawful medical examination' under the ADA." Kiel v. Mayo Clinic Health Sys. Se. Minn., 685 F. Supp. 3d 770, 788 (D. Minn. 2023) (citation omitted), rev'd and remanded on other grounds, Ringhofer, 102 F.4th 894; see also McCone v. Exela Techs., Inc., No. 6:21-CV-912-CEM-DCI, 2023 WL 7200949, at *9 (M.D. Fla. June 28, 2023) ("[C]ourts have held that it was not unlawful for employers to take reasonable safeguards—such as requiring COVID-19 testing—to prevent the spread of COVID-19 in the workplace." (collecting cases)), report and recommendation adopted, No. 6:21-CV-912-CEM-DCI, 2023 WL 7200965 (M.D. Fla. Aug. 23,

2023).  Thus, we find that MDHS's requirement that Zarn participate in weekly Covid-19 testing did not violate the ADA.

III.

Lastly, Zarn contends that the "lack of completeness, investigation, or supplementation" in MDHS's interrogatory answers are evidence of bad faith, and as such, the district court erred by failing to draw an adverse inference against MDHS.

Zarn did not properly preserve this issue for our review.  The discovery period closed on January 5, 2024, and discovery-related motions were due 14 days later. Zarn did not file any motions concerning the alleged inadequacy of MDHS's discovery responses.  He did not file a Rule 36(a) motion asking the district court to determine the sufficiency of MDHS's responses nor did he file a Rule 37(a) motion to compel documents or disclosures.  Additionally, he did not file a Rule 56(d) motion seeking to delay ruling on MDHS's motion for summary judgment.  As such, the district court did not abuse its discretion in granting summary judgment based on the record before it.  See Nolan v. Thompson, 521 F.3d 983, 987 (8th Cir. 2008) (holding that the district court did not abuse its discretion in granting summary judgment based on the record before it when a party did not file a Rule 36(a), 56(d), or 37(a) motion); see also Osborne v. Grussing, 477 F.3d 1002, 1007 n.3 (8th Cir. 2007) (finding "the discovery issue was not properly preserved" when the party did not file what is now referred to as a Rule 56(d) motion).

In any case, adverse inference instructions are typically given as a sanction when a party intentionally destroys evidence to suppress the truth.  See Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 811 (8th Cir. 2005); Morris v. Union Pac. R.R., 373 F.3d 896, 900 (8th Cir. 2004).  Zarn does not contend that MDHS destroyed relevant documents; instead, he argues that it submitted incomplete discovery responses.  The appropriate sanction for this alleged conduct would be to reopen discovery; however, as discussed above, Zarn forfeited this argument by

-14-

failing to make a Rule 36(a), 56(d), or 37(a) motion.  See Best Buy Stores, L.P. v. Devs. Diversified Realty Corp., Civ. No. 05-2310 DSD/JJG, 2008 WL 2439850, at *4 (D. Minn. June 12, 2008) (finding that where "defendants argue that [the plaintiff] has not produced all of the relevant documents . . . the most appropriate sanction is to reopen fact discovery"—not an adverse inference instruction).

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____